IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 9, 2015 Session

## STATE OF TENNESSEE v. SHAUN ROYAL HILL

**Direct Appeal from the Circuit Court for Tipton County**
**No. 7697          Joe H. Walker, Judge**

_____

**No. W2015-00710-CCA-R3-CD   -   Filed June 9, 2016**

_____

A Tipton County jury convicted the Defendant, Shaun Royal Hill, of rape, and the trial court sentenced him to fifteen years in confinement.   On appeal, the Defendant contends that: (1) the evidence was insufficient to sustain his conviction; (2) the trial court erred when it admitted the Defendant's phone records into evidence; (3) the Defendant was prejudiced by the jury venire and the jury selection process; (4) the trial court erred when it failed to instruct the jury regarding the collection and preservation of evidence; (5) the trial court erred when it allowed the State to impeach a witness through another witness's testimony; (6) the trial court erred when it restricted the Defendant's cross-examination of the victim; (7) the State made improper comments throughout trial; and (8) the trial court erred when it sentenced him.   After a thorough review of the record and applicable authorities, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Michael E. Scholl, Memphis, Tennessee (on appeal); and Charles Brasfield, Covington, Tennessee (at trial) for the appellant, Shaun Royal Hill.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Mike Dunavant, District Attorney General; Jason R. Poyner and James Walter Freeland, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial**

This case arises from a sexual assault of the victim, A.B.,[1] that occurred on April 7, 2013, for which a Tipton County grand jury indicted the Defendant for rape. At the Defendant's trial, the following evidence was presented: the victim testified that, at the time of this offense in April 2013, she was twenty years old and living with her aunt and sometimes her grandmother, saying that she went "back and forth" between the two residences. The victim stated that she visited the home of her cousin, Tasha Grant, on April 5, 2013, and that the Defendant, whom she had never met, was there. The victim did not engage in much conversation with the Defendant, except to ask him for a cigarette lighter. The victim left Ms. Grant's house at 8:00 or 9:00 p.m. with her aunt and the two went to her aunt's house. The victim and her aunt spent the night there and the next day the victim's aunt left town for a trip to Arkansas.

The victim described her aunt's house as having two bedrooms with five or six doors inside the home. She stated that everyone entered and exited the house through the back door. The victim recalled that her "Uncle Larry" visited her at the house on the night of April 7 and went out the back door when he left. The victim stated that she locked the back door after he left, and then she went to sleep on the couch. She recalled that she was in a "downwards mood," like a depression, that evening and did not feel well, in part because she was menstruating.

The victim stated that she was awakened in the middle of the night by the Defendant, who smelled like liquor and who seemed intoxicated. She stated that she could see the Defendant's face in the light coming through the window. The victim denied that she had called him to come over, explaining that the home did not have a landline and that she did not have a cell phone. When the Defendant awoke the victim, she said, "What are you doing here?" The Defendant replied that the door was "wide open."

The victim testified that the Defendant held her down on the couch and took her pants off and then put his penis inside her vagina. The Defendant held her down on her shoulders and by holding her leg in the air. The victim told him "it hurt," and she kicked him in the face. The victim testified that she had recently lost her virginity, which she opined explained why the Defendant's penetration of her was so painful. The Defendant "got off of [her]," laughed, kissed the victim on her face, and walked out of the house, leaving through the back door. The victim testified that the Defendant did not ejaculate or use a condom. The victim stated that she did not immediately tell anyone about what had happened because she did not know what to do.

---

[1]In keeping with the policy of this Court, we will refer to the victim by her initials only to protect her privacy.

The next day, the victim saw the Defendant again, and he said "he wanted some more." The victim moved away from him and told her younger cousin that the Defendant had raped her. Later that day, she also told her aunt and grandmother. The following morning, the victim went to the police station with her grandmother and spoke to two officers. She later went to the health department to be checked for sexually transmitted diseases.

On cross-examination, the victim testified that she took "sleeping medicine" the night of the rape, which she took for anxiety and depression. The victim stated that she moved to Tennessee with her grandmother and reiterated that she lived with her aunt. She stated that she also lived with her grandmother and went back and forth between the two homes every other day. The victim agreed that she had equal number of belongings at her aunt's and grandmother's homes. She denied that her uncle, Larry Craig, ever slept at either home but stated that he did come to check on her often.

The victim denied having met the Defendant prior to meeting him at Ms. Grant's house, and she reiterated that her only interaction with him was to ask him for a lighter for her cigarette. She denied flirting with him or exchanging phone numbers with him. Recalling the events surrounding the rape, the victim acknowledged that she testified at the preliminary hearing that her uncle had locked the door after he left, as opposed to her trial testimony that she locked the door. She testified that the Defendant had forcibly entered her aunt's house and there were signs of forced entry on the back door, which she discovered the next morning. The victim also stated that she did not testify at the preliminary hearing about her menstrual cycle. She stated that there was blood in her pants after the rape, but she never gave the pants to law enforcement because she was never asked for them. The victim testified that, the day after the rape, her uncle came over to visit her, and they watched television together. She did not tell him about the rape.

Larry Craig, the victim's great-uncle, testified that on the weekend of April 6-7, 2013, the victim's aunt, also his niece, went to Arkansas, and so he went to check on the victim at her aunt's house. He stated that he used the back door to enter and exit the house. He recalled that the door was "flimsy." Mr. Craig testified that he knew the Defendant through the Defendant's family. Mr. Craig stated that, after he checked on the victim the night of April 6, he returned the next day, April 7, to check on her again. He recalled that, when he left the victim on April 6, she was lying on the couch where she normally slept. Mr. Craig stated that the victim did not have a cell phone and that there was no landline in the house where she slept.

Mr. Craig testified that on April 7, when he was visiting the victim at her aunt's house, the Defendant and his cousin stopped by. Mr. Craig recalled that the victim left

3

the house when the two men arrived and did not return until after Mr. Craig left. He testified that he had no knowledge of any type of relationship between the victim and the Defendant, and he stated that the victim had not lived in Tennessee for very long. Mr. Craig stated that he did not find out about the rape until the following week.

The victim's grandmother testified that she lived with her husband and that the victim stayed with them sometimes. She recalled that the victim told her about being raped by the Defendant. The victim was crying and hurt. At the time, the victim had been living in Tennessee a few weeks and did not know the Defendant. The victim's grandmother took the victim to the police station and then the health department where she was examined. The victim's grandmother was not permitted to be present for the examination because the victim was not a minor.

The victim's aunt testified that the victim lived with her. The victim's aunt testified that she went out of town the weekend of April 6-7, 2013, and returned Sunday night, April 7. The victim told her aunt about the rape after she returned home. The victim was "very upset" and crying when she told her aunt what had happened. The victim's aunt stated that she was not surprised by what the victim told her had happened. The victim's aunt testified that the victim did not have a cell phone and that there was no landline at the aunt's house.

On cross-examination, the victim's aunt testified that the Defendant's cousin was married to her cousin. She stated that the Defendant did not "hang out" at her house but that she would see him out around town. She testified that she had never seen the victim and the Defendant together, other than the night they were all present at Ms. Grant's house. After the victim told her about the rape, the aunt checked the back door or her house and described it as "chipped."

Andrew Hefner, a police officer, testified that he interviewed the victim on Monday, April 8. The victim and her grandmother came to the police department together to file a complaint. Sergeant Hefner described the victim as very upset, and he could tell she had been crying. He said she cried a couple of times while talking to him and seemed embarrassed to talk about what had happened. The victim told him that on the night of April 6 or the early morning of April 7, the Defendant had raped her. After talking with the victim, Sergeant Hefner assigned the case to Detective Willis.

Detective Alan Willis testified that he met with the victim on Monday, April 8 about her rape complaint. He also met with the Defendant separately. Detective Willis testified that he visited both the victim's aunt's house and her grandmother's house. Detective Willis also went to the Defendant's brother's house and requested that the Defendant be interviewed at the police department. The Defendant came to the police

department where he was given an Admonition and Waiver of Rights document, which the Defendant signed to indicate that he understood his rights. During the interview, the Defendant told Detective Willis that the victim called him on the night of the rape around 2:00 a.m. He went over to the victim's aunt's house around 4:00 a.m. and had sex with the victim. The Defendant stated that the victim let him inside the house. He also stated that their sexual encounter was consensual.

Detective Willis testified that he subpoenaed the Defendant's cell phone records to determine if the victim had called him the night of the rape. The phone records were admitted into evidence over the Defendant's objection that the documents were not self-authenticating. Detective Willis testified that the phone records did not show an incoming call on the morning of April 7, 2013, at 2:00 a.m. Detective Willis stated that the victim did not have a cell phone and there was no landline at her aunt's house. He testified that the victim's aunt had a cell phone, but that she was out of town at the time of the rape and her cell phone was with her.

Based on his investigation, Detective Willis arrested the Defendant. Detective Willis testified that he was not made aware that the victim had pants with blood on them from the rape. He agreed that the victim was taken to a rape crisis center, but his recollection was that she had already taken a shower when she was examined.

On cross-examination, Detective Willis testified that he only spoke to the victim at the police department and not the victim's grandmother. He stated that a female officer was present when he spoke to the victim. Detective Willis recalled that the victim told him it was her second time having sexual intercourse and that she did not like intercourse the first time. He "remembered something" about the victim menstruating at the time of the rape.

Detective Willis testified that he never told the victim to get a physical examination because the Defendant admitted to having intercourse with her and because the victim stated that there had not been a struggle between her and the Defendant. Detective Willis testified that he did not ask the victim to bring any of her clothes in as evidence because all they would have shown was that she had intercourse with the Defendant, a fact to which the Defendant admitted.

Detective Willis testified that the Defendant willingly came to the police department and spoke with him. The Defendant admitted to having intercourse with the victim but said it was consensual. Detective Willis agreed that he subpoenaed the Defendant's phone records to see if the victim had called him the night of the rape to invite him over; no calls were made to the Defendant's cell phone during the time period of the rape.

On behalf of the Defendant, Rollo Jones, Sr., the Defendant's first cousin, testified that he was with the Defendant and the Defendant's cousin on the night of the rape and that Mr. Jones dropped the Defendant off at the victim's aunt's house at around 3:30 or 4:00 a.m. He watched the Defendant go inside the house through the side door but never saw the Defendant force the door open. Mr. Jones drove away after the Defendant went inside the house.

On cross-examination, Mr. Jones agreed that he had called the Defendant at around 12:30 a.m. on the night of the rape.

Quinton Hill, another first cousin of the Defendant, testified that he used to live with a man named Jeremy Grant, who was the victim's cousin. He stated that he knew the victim from the occasions when she visited the Grants from out of town. Mr. Hill testified that on Saturday, April 6, he, the Defendant, and Mr. Jones went to a club and drove home early Sunday morning. Mr. Hill stated that he was asleep in the car. The men dropped the Defendant off at the victim's aunt's house, and then Mr. Hill dropped off Mr. Jones before he went home. Mr. Hill called the Defendant the next morning and picked the Defendant up at the store before driving to the victim's aunt's house. Mr. Hill stated that it was his idea to go there at "random." When they arrived, Larry Craig was at the house, as well as the victim. The victim did not seem upset but was quiet, which Mr. Hill described as her usual demeanor. Mr. Hill could not recall whether the victim spoke to the Defendant.

On cross-examination, Mr. Hill agreed that he had pleaded guilty to delivery of Schedule II cocaine on the day of the Defendant's trial and that he received a sentence of eight years. Mr. Hill denied that he was a cocaine dealer but stated that he was "in the wrong place at the wrong time."

Based upon this evidence, the jury convicted the Defendant of rape.

## B. Sentencing

At the sentencing hearing, the State offered the presentence report and certified copies of the Defendant's convictions. Those convictions showed that the Defendant had previously been convicted of three felony drug charges, sufficient to classify him as a multiple offender. April McCommon testified that she had prepared the presentence report and that the Defendant had not filled out the questionnaire she provided to him.

Based upon this evidence, the trial court found that the Defendant would be sentenced as a multiple offender, stating that the Defendant had multiple convictions

beyond those necessary to establish the appropriate range, including multiple misdemeanor convictions in Tipton and Haywood counties. The trial court found no mitigating factors and sentenced the Defendant to fifteen years to be served at one hundred percent. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence was insufficient to sustain his conviction; (2) the trial court erred when it admitted the Defendant's phone records into evidence; (3) the Defendant was prejudiced by the jury venire and the jury selection process; (4) the trial court erred when it failed to instruct the jury regarding the collection and preservation of evidence; (5) the trial court erred when it allowed the State to impeach a witness through another witness's testimony; (6) the trial court erred when it restricted the Defendant's cross-examination of the victim; (7) the State made improper comments throughout trial; and (8) the trial court erred when it sentenced the Defendant.

## A. Sufficiency

The Defendant contends that the evidence was insufficient to support his conviction because there was no physical evidence indicating that the sexual encounter was not consensual and because the victim's testimony is "riddled with conflicting facts." The State responds that the victim's testimony alone is sufficient evidence for a jury to convict the Defendant of rape. It further contends that physical evidence is not a prerequisite to conviction. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is

based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

As applicable to this case, rape is defined as the "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances: force or coercion is used to accomplish the act[.]" T.C.A. § 39-13-503(a)(1) (2014). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal opening of the victim's, the

defendant's, or any other person's body, but emission of semen is not required[.]" T.C.A. § 39-13-501(7).

The evidence in this case, viewed in the light most favorable to the State, showed the victim went to sleep at her aunt's house, after locking the back door after her uncle's visit. She was awakened in the middle of the night by the Defendant, who was inside the house. The Defendant forcibly held her down on the sofa where she lay, pinning her shoulders down by holding her leg up. He pulled the victim's pants down and then he penetrated her vagina with his penis. The victim told him, "No" and used her leg to kick the Defendant in the face. The Defendant then kissed her and left the house. We conclude that this evidence is sufficient to prove that the Defendant unlawfully sexually penetrated the victim by force. As for the lack of physical evidence, no such evidence is required to corroborate the victim's testimony that she was raped. *See State v. Bobby Barrett*, No. W1999-02002-CCA-R3-CD, 2000 WL 1840073, at *8 (Tenn. Crim. App., at Jackson, Dec. 12, 2000), *perm. app. denied* (Tenn. May 21, 2001). The Defendant is not entitled to relief on this issue.

## B. Phone Records

The Defendant next contends that the trial court erred when it admitted his cell phone records into evidence because they were unauthenticated and were not admitted pursuant to statutory procedure found at Tennessee Code Annotated section 24-7-116. The State agrees that the phone records were hearsay evidence that should not have been admitted without authentication; however, it contends that the admittance of the records and the correlating testimony did not substantially impact the outcome of the trial and thus constitutes harmless error.

Tennessee Code Annotated section 24-7-116 (2014) governs the admissibility of telephone records and the process by which they should be admitted into the record. The required procedure dictates that a "custodian or other authorized agent of the company shall . . . file with the court clerk a true and correct copy of all records . . . [and] be accompanied by an affidavit of the custodian stating in substance:

(A) That the affiant is duly authorized custodian of the records and has authority to certify the records;

(B) That the copy is a true copy of all the records described in the subpoena; and

(C) That the records were prepared by the personnel of the company acting under the control of the company, in the ordinary course of business.

9

T.C.A. § 24-7-116(a)(1)(A)-(C).  The Defendant contends, and the State concedes, that this procedure was not followed when the Defendant's cell phone records were introduced into evidence through Detective Willis's testimony.  Based on our review of the testimony, we agree with the Defendant's contention that the phone records were admitted in error.

However, the State argues that this error was harmless, stating that "evidentiary rulings . . . are subject to a non-constitutional harmless error analysis," and that this error did not affect the outcome of the trial.  We agree with the State.  Evidentiary errors such as this one are analyzed under the non-constitutional framework.  *State v. John Daniel Simmons*, No. M2014-02086-CCA-R3-CD, 2015 WL 7354311, at *10 (Tenn. Crim. App., at Nashville, Nov. 20, 2015), *no perm. app. filed* (citing *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)).  Pursuant to the non-constitutional harmless error analysis, "the defendant bears the burden of demonstrating that the error more probably than not affected the judgment or would result in prejudice to the judicial process."  *Id.* at 8 (internal quotation marks omitted).  Furthermore, "the stronger the evidence of the defendant's guilt, the heavier the burden is on the defendant to prove that a non-constitutional error was not harmless."  *Id.*  The question of harmless error, however, does not rest upon "whether there was sufficient evidence to support a defendant's conviction," rather, "what impact the error may reasonably be taken to have had on the jury's decision-making."  *Id.*

We conclude that the admission of the cell phone records was harmless error.  The records were introduced to refute the assertion that the victim called the Defendant in the middle of the night to invite him over to her aunt's house.  The victim testified that she did not call the Defendant, that she did not have her own cell phone, and that there was not a landline at her aunt's house.  Multiple other witnesses confirmed that the victim's aunt's house had no landline.  The victim's aunt confirmed this and also stated that she had taken her own cell phone with her on her trip.  The victim's uncle further corroborated the victim's testimony that the victim had no access to a phone on the night of the incident and thus, could not have called the Defendant's cell phone.  The admitted phone records merely added credence to that which three witnesses testified to: that the victim did not and could not have called the Defendant and invited him over because she did not have a phone.  In light of the consistent testimony from the three witnesses, we do not believe that the phone records changed the jury's verdict or affected the outcome of the trial.  The error was harmless, and the Defendant is not entitled to relief on this issue.

### C.  Jury Venire and Selection

10

The Defendant next contends that he was convicted by a jury that was "not a group of his peers," contending that there were only two African-American males in the jury pool. He also contends that, because the Tipton County jury pool had been subjected to the voir dire process in multiple recent jury trials, the jury pool for the Defendant's trial was "frustrated by the voir dire process" and unresponsive to many of the questions asked during voir dire. Because the potential jurors were "exhausted from the process" from "multiple trials," "there [were] no longer interested in the process," depriving him of the right to a fair and impartial jury. The State responds that the record contains no evidence to support the Defendant's assertion and, therefore, this Court cannot "speculate on whether the representation of African-Americans on the jury venire was fair and reasonable in relation to their numbers in the community." The State further responds that the Defendant's claim that the jury was frustrated and exhausted is not supported by any evidence and that he has failed to demonstrate any prejudice.

The rules "prescribing jury selection procedures are intended to protect the integrity of the jury system by providing a uniform and ordered method that ensures the accused a fair and impartial jury chosen from a fair cross-section of the community." *State v. Coleman*, 865 S.W.2d 455, 458 (Tenn. 1993). When a defendant alleges error in the jury selection process, "[i]t is the burden of the defendant to prove prejudice or purposeful discrimination in the selection of a jury. Prejudice will not be presumed." *Id.*

We first note that the Defendant did not object to the makeup of the jury or the number of jurors who had previously served on juries until after the State had rested its case, which the trial court noted was "late" in the process. The trial court responded that the jury venire included "a number of African-Americans" and noted that the Defendant excused one or more of them from the pool himself. The trial court also stated that it was aware that "a number" of the jurors had served on multiple trials in Tipton County and asked defense counsel for law to support his claim that this prejudiced the Defendant's trial; defense counsel was unable to provide any support for this argument. In his brief the Defendant does not provide us with any evidence of how the makeup of the jury, either based on their race or the number of juries upon which they had recently served, deprived him of a fair and impartial jury. He merely contends that there was inadequate representation of the races, without providing any statistics related to the population of Tipton County and the percentage of different races within the county, and that the jury was not "fresh and ready to listen to a case," without providing a single instance when a juror indicated they were not willing to sit and listen as an impartial fact finder. We will not presume prejudice or discrimination based on his claims alone. *See State v. Shaw*, 37 S.W.3d 900, 914 (Tenn. 2001) (the jury is presumed to follow instructions). The Defendant is not entitled to relief on this issue.

11

## D. Jury Instructions

The Defendant next contends that the trial court erred when it failed to instruct the jury on the State's duty to preserve evidence, found at Tennessee Pattern Jury Instruction 42.23, which he cites as the duty to preserve any "evidence that might be expected to play a significant role in the suspect's defense." The Defendant argues that Detective Willis testified he made no effort to gather evidence of the rape, and thus, the Defendant had a right to this jury instruction. The State responds that the instruction was not warranted because the State did not have a duty to collect evidence from the victim or from the crime scene.

A trial court has the duty to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). Nothing short of a "'clear and distinct exposition of the law'" satisfies a defendant's constitutional right to trial by jury. *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304 (Tenn. Crim. App. 1987)). In other words, the trial court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. *Elder*, 982 S.W.2d at 876. Because questions regarding the propriety of jury instructions are mixed questions of law and fact, our standard of review here is de novo, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

The Defendant contends that the trial court erred when it failed to instruct the jury with regards to the State's duty to preserve evidence, found at Tennessee Pattern Jury Instruction 42.23, which states:

> The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value. Such evidence must be of such a nature that the defendant would be unable to obtain comparable evidence through reasonably available means. The State has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value, so that an as yet unknown defendant may later examine the evidence.
>
> If, after considering all of the proof, you find that the State failed to gather or preserve evidence, the contents or qualities of which are an issue and the production of which would more probably than not be of benefit to

12

the defendant, you may infer that the absent evidence would be favorable to the defendant.

T.P.I.-Criminal 42.23.    The State's duty to preserve evidence, and the exculpatory value of evidence, is difficult to define, as our Supreme Court noted in *State v. Ferguson*:

> the duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.    To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

2 S.W.3d 912, 917 (Tenn. 1999) (citing *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)).

The Defendant specifically attacks the State's failure to uphold its duty when it did not procure the pants the victim was wearing at the time of the rape and when it did not direct the victim to be subjected to a rape kit examination.    We agree with the State that it did not have a duty to collect or preserve either of these items of evidence.    Detective Willis testified that the Defendant agreed that he had intercourse with the victim, albeit consensual.    As such, the detective did not ask the victim for her pants because she did not contend to have struggled with the Defendant during their encounter.    Therefore, in our view, the victim's pants had no exculpatory value because they did not provide evidence of consensual sex, only that the victim and the Defendant had engaged in a sexual act.    The same conclusion follows from the assertion that a rape kit examination should have been conducted; it had no exculpatory value because it would have merely revealed a sexual encounter between the victim and the Defendant and would not have made it more or less likely that the encounter was consensual.    As such, the State was under no duty to gather these items of evidence and thus, the trial court did not err when it declined to instruct the jury accordingly.    The Defendant is not entitled to relief on this issue.

## E.    Impeachment of Mr. Hill

The Defendant next asserts that the trial court erred when it allowed the State to impeach a witness, Quinton Hill, through its questioning of another witness, Rollo Jones. The Defendant argues that Mr. Hill was properly impeached with his own conviction during his testimony, but that the State should not have been allowed to ask Mr. Jones

about Mr. Hill's criminal history. The State responds that the Defendant has waived review of this issue and that plain error review is not warranted. The State further contends that the Defendant objected to the question directed at Mr. Jones regarding Mr. Hill's criminal history, and that Mr. Jones did not answer the question, and thus the State did not actually impeach Mr. Jones.

Rule 609 of the Tennessee Rules of Evidence permits the State to attack the credibility of a criminal defendant by presenting evidence of prior convictions. *See* Tenn. R. Evid. 609. This Court reviews the trial court's ruling on the admissibility of prior convictions for impeachment purposes under an abuse of discretion standard. *See State v. Mixon*, 983 S.W.2d 661, 675 (Tenn. 1999); *State v. Blanton*, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996). A trial court abuses its discretion only when it "'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)). If a trial court fails to comply with the procedural requirements of Rule 609, then the trial court's decision is not entitled to deference. *State v. Lankford*, 298 S.W.3d 176, 182 (Tenn. Crim. App. 2008).

The Defendant states that his cousin, Quinton Hill, who testified on behalf of the Defendant, was properly impeached with his own prior felony criminal history. However, the Defendant contends that Mr. Jones, another cousin who testified on behalf of the Defendant, was improperly impeached when he was asked about Mr. Hill's prior criminal history. Although the Defendant does not point us to the exact testimony during which the alleged erroneous impeachment occurred, we presume it to be when the State asked Mr. Jones whether he knew that Mr. Hill was a drug dealer. Defense counsel objected immediately, before Mr. Jones answered the question, and the trial court sustained the objection. The witness never responded to the question and the State proceeded with a different line of questioning.

We agree with the State that because the Defendant failed to raise this evidentiary issue in his motion for new trial, he risks waiver of appellate review. *See* Tenn. R. App. P. 3(e) ("no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial[.]") We also agree that this complaint lacks merit because no actual impeachment of the witness occurred. The trial court sustained the Defendant's objection and Mr. Jones never answered the question. Furthermore, the impeachment evidence had already been presented to the jury through impeachment of Mr. Hill. The Defendant is not entitled to relief on this issue.

## F. Cross-Examination of the Victim

14

The Defendant next contends that the trial court improperly limited the Defendant's ability to cross-examine the victim about the aftermath of the rape. The State responds that the trial court properly sustained the State's objection to a question directed to the victim because it was not relevant.

During cross-examination of the victim, the following exchange occurred:

Victim: Yeah, [the health clinic] gave me a pregnancy test too. Gave me a pregnancy test and disease test. They didn't give me [a rape kit]. It had nothing to do with my vagina.

Defense counsel: Okay. Were you nervous you might be pregnant?

Victim: No, sir.

Defense: So why did you have a pregnancy test?

The State objected to defense counsel's question, and the trial court sustained the objection. Defense counsel then asked the victim again why she took a pregnancy test if she was not nervous that she was pregnant. The State's objection to the question was again sustained.

In Tennessee, the determination of whether proffered evidence is relevant in accordance with Tennessee Rule of Evidence 402 is left to the sound discretion of the trial judge, as is the determination of whether the probative value of evidence is substantially outweighed by the possibility of prejudice pursuant to Tennessee Rule of Evidence 403. *State v. Kennedy*, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999) (citing *State v. Forbes*, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995); *State v. Burlison*, 868 S.W.2d 713, 720-21 (Tenn. Crim. App. 1993)). In making these decisions, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial. *State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). We will only disturb an evidentiary ruling on appeal when it appears that the trial court arbitrarily exercised its discretion. *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989).

Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403. These rules require that the trial court must first determine whether the proffered evidence is relevant. Pursuant to Rule 401, evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence

to the determination of the action more probable or less probable than it would be without the evidence." *See Forbes*, 918 S.W.2d at 449 (quoting Tenn. R. Evid. 401). In other words, "evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., <u>Tennessee Law of Evidence</u> § 4.01[4], at 4-8 (4th ed. 2000). After the trial court finds that the proffered evidence is relevant, it then weighs the probative value of that evidence against the risk that the evidence will unfairly prejudice the trial. *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002). If the court finds that the probative value is substantially outweighed by its prejudicial effect, the evidence may be excluded. Tenn. R. Evid. 403. "'[E]xcluding relevant evidence under [Tenn. R. Evid. 403] is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion.'" *James*, 81 S.W.3d at 757-58 (quoting *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999) (citations omitted)).

The Defendant complains that the trial court limited defense counsel's ability to explore the possibility that risk of pregnancy was the victim's motive to lie and say that she had been raped. We conclude that this evidence was not relevant in this case and that its introduction would not have made it more or less likely that her sexual contact with the Defendant was not consensual. Thus, the trial court properly limited defense counsel during cross-examination on this issue. The Defendant is not entitled to relief.

## G. State's Improper Comments and Argument

The Defendant contends that throughout the trial the State asked "inappropriate questions" designed to elicit inappropriate responses from witnesses, and that the State made improper comments throughout trial and during closing arguments. He contends that the State "misstat[ed] evidence," disobeyed the trial court's orders, "inject[ed]" irrelevant issues into the trial, and expressed an opinion about the Defendant's guilt. He contends that these instances constituted a violation of his due process rights. The State responds that the Defendant has waived review of this issue because he failed to contemporaneously object at trial and furthermore that the Defendant has failed to demonstrate prosecutorial misconduct related to these instances.

When reviewing allegations of prosecutorial misconduct, "[t]he general test to be applied is whether the improper conduct could have affected the verdict to the prejudice of the defendant." *Harrington v. State*, 385 S.W.2d 758, 759 (1965); *see also State v. Richardson*, 995 S.W.2d 119, 127 (Tenn. Crim. App. 1998). The factors relevant to the court's determination are: (1) the conduct complained of viewed in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the

16

relative strength and weakness of the case. *State v. Nesbit*, 978 S.W.2d 872, 894 (Tenn. 1998). Additionally, there are five recognized areas of prosecutorial misconduct during closing argument: (1) intentionally misstating the evidence or misleading of the jury on the inferences it can draw; (2) expressing personal beliefs or opinions; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) adding outside issues to the guilt or innocence issue; and (5) arguing or referring to outside facts. *State v. Goltz*, 1 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003).

The Defendant complains of several instances of misconduct during the evidentiary phase of the trial. In the first instance, the prosecutor asked the victim's aunt if she was surprised by what the victim had told her the Defendant had done, and the victim's aunt replied that she was not. The witness made no further comment, and the State did not ask another question on this issue. No objection was made by the Defendant. He now argues that this was an attempt to open the door to the Defendant's past crimes and behaviors. We conclude that this question and the witness's answer did not prejudice the Defendant, because no further questions on the issue were asked, and the jury heard no testimony from this witness about the Defendant's past crimes or behaviors. We further note that the Defendant did not request a curative measure from the trial court.

The second instance was when the State made a comment about defense counsel misspelling the victim's name. During redirect-examination of the victim, the State asked her how to spell her last name, which she did, and then the State made a comment that defense counsel had misspelled her name on a sticky note attached to an exhibit. No objection was made by the Defendant. The Defendant now contends that the State's comment had no relevance and was an attempt to "inflame the jury and belittle the defense." We agree with the Defendant that the comment was unnecessary and irrelevant to the charge of rape. However, the Defendant has presented no evidence to support his claim that the comment had any impact on the jury or affected the outcome of their verdict.

The final instances complained of by the Defendant occurred during closing arguments. First, the Defendant contends that the State made an incorrect, inflammatory comment about the evidence when it said the following: "With a wicked grin the next day [after the rape] [the Defendant] came back to his victim and he said to her, "I want some more." The Defendant contends that this comment was an intentionally incorrect statement of the evidence designed to prejudice the jury. We agree that no evidence was presented that the Defendant had a grin on his face when he told the victim, at her aunt's house the day after the rape, that he "wanted some more;" we note that the victim did testify that the Defendant made the comment. However, the Defendant has failed to show how this comment prejudiced the jury or affected its

17

verdict. He also failed to object or request a curative instruction when the irrelevant comment was made. The Defendant also complains that the State referred to the Defendant's cousin, Mr. Hill, as a "drug dealer" when addressing his credibility as a witness and that fact was not in evidence. We disagree. Mr. Hill testified that he had recently pleaded guilty to delivery of Schedule II cocaine, although he denied that he was a drug dealer. It was well within the State's province to argue, based on his conviction, that Mr. Hill was a drug dealer, and it was for the jury to consider Mr. Hill's credibility in light of his felony conviction. The State's comment during closing argument was not improper.

Having reviewed each instance complained of, we conclude that there is nothing in the record to support the Defendant's contention that the State's comments or questions fall into the arena of prosecutorial misconduct. The Defendant is not entitled to relief on this issue.

## H. Sentencing

The Defendant lastly contends that the trial court erred when it sentenced him. He alleges that his sentence is excessive considering the mitigating factors and the proof at the sentencing hearing. The State responds that the trial court properly sentenced the Defendant.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case." *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and

principles listed by statute." *Bise*, 380 S.W.3d at 709-10. In other words, so long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707. Further, we review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851 (Tenn. 2013).

In the present case, the trial court sentenced the Defendant as a Range II offender to a fifteen-year sentence, after finding that the Defendant was a multiple offender, with multiple convictions beyond those necessary to establish the appropriate range, including multiple misdemeanor convictions in Tipton and Haywood counties. The trial court found no mitigating factors. The Defendant alleges that the trial court should have considered as mitigation that the Defendant worked while on bond and had the support of multiple family members. In light of those factors, the Defendant contends that ordering him to serve his sentence at one hundred percent was excessive.

We conclude that the trial court did not abuse its discretion when it imposed a within range sentence in this case. The Defendant's history of criminal convictions, both felony and misdemeanor, in multiple counties, is lengthy. No evidence of mitigation was presented at the sentencing hearing. Accordingly, we conclude that the trial court did not abuse its discretion when it found that the Defendant was a multiple offender and imposed an in-range sentence to be served in incarceration. Furthermore, the requirement that the Defendant serve one hundred percent of his sentence is statutorily required. *See* T.C.A. § 40-35-501(i)(2) (2014). The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

19